**UNITED STATES**

v.

**Airman First Class Jiovanni V. TORRES, United States Air Force.**

**ACM 34879.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 8 Sept. 2001.

Decided 9 June 2004.

Appellate Counsel for Appellant: Colonel Beverly B. Knott, Major Terry L. McElyea, and Captain Jennifer K. Martwick.

Appellate Counsel for the United States: Colonel LeEllen Coacher, Lieutenant Colonel Lance B. Sigmon, and Lieutenant Colonel Jennifer R. Rider.

Before PRATT, MALLOY, and GRANT, Appellate Military Judges.

## OPINION OF THE COURT

MALLOY, Judge:

The appellant was tried by a general court-martial in a mixed plea case before a military judge sitting alone. Consistent with his pleas, he was convicted of one specification of absence without leave (AWOL),[1] one specification of wrongfully using methamphetamine, and one specification of wrongfully using marijuana, in violation of Articles 86 and 112a, UCMJ, 10 U.S.C. §§ 886, 912a. Contrary to his pleas, he was also convicted of two specifications of distributing methamphetamine, one specification of larceny, and one specification of committing an indecent act on a female under the age of 16 years, in violation of Articles

---

1. This specification alleged that the AWOL was terminated by apprehension. The appellant excepted the words pertaining to apprehension from his guilty plea and the military judge's findings were consistent with the appellant's plea.

112a, 121 and 134, UCMJ, 10 U.S.C. 912a, 921, 934. The appellant was sentenced to a dishonorable discharge, confinement for 42 months, and reduction to airman basic. The convening authority approved the sentence as adjudged. We have jurisdiction under Article 66, UCMJ, 10 U.S.C. § 866.

On appeal, the appellant raises four assignments of error: (1) The military judge erred when he failed to suppress items seized from the appellant's automobile as the fruits of an unlawful search; (2) The military judge erred when he failed to suppress the appellant's 23 April 2001 confession to agents of the Air Force Office of Special Investigations (AFOSI) because it was tainted by an earlier involuntary confession to civilian police; (3) The appellant was denied a speedy trial, in violation of Rule for Courts–Martial (R.C.M.) 707, Article 10, UCMJ, 10 U.S.C. § 810, and the Sixth Amendment to the United States Constitution; and (4) The sentence to a dishonorable discharge was inappropriately severe.

We disagree with the appellant's assertions that the military judge erred by admitting items seized from the appellant's automobile at the time of his arrest by civilian police or that he was denied a speedy trial. We agree, however, that it was error to admit his confession to the AFOSI agents, even though made after proper rights advisement under Article 31, UCMJ, 10 U.S.C. § 831, because the prosecution failed to prove that it was untainted by a prior statement taken by a civilian police officer in violation of the appellant's rights under the Fifth Amendment of the United States Constitution. In light of this error, it is unnecessary to address the appropriateness of a dishonorable discharge.

## I. Background

The appellant was a technical training student at Sheppard Air Force Base (AFB) at the time he committed the offenses that led to this court-martial. Sheppard AFB is located in Wichita Falls, Texas. While under AFOSI investigation for rape, an allegation that was not charged in this case, the appellant absented himself from his unit on approximately 30 March 2001. On 23 April 2001, Wichita Falls Police Department (WFPD) officers arrested the appellant while investigating a complaint unrelated to the appellant. The appellant remained in civilian custody until 21 May 2001. At that time, a local judge dismissed state criminal charges against him to clear the way for military prosecution, and the local district attorney formally notified the Air Force of this decision two days later. The appellant was placed in pretrial confinement immediately after the Air Force assumed jurisdiction for the case. Because Sheppard AFB does not have a confinement facility, he remained in the same civilian confinement facility. The appellant's Article 32, UCMJ, 10 U.S.C. § 832, investigation was held on 10 August 2001 and he demanded a speedy trial on that same date. He was arraigned on 5 September 2001.

## II. Search of the Automobile

### A. Background

On 23 April 2001, Officer Sean Sullivan of the WFPD was dispatched to investigate a complaint involving malicious damage to an automobile. The subject of this complaint was a 14–year–old girl, NC. She was well known to Officer Sullivan as a result of previous police contacts. Officer Sullivan and fellow officers were briefed at the start of their shift that she and another girl, SF, were runaways. While Officer Sullivan was taking the report involving damage to an automobile, Officer Brian Bohn, who was at the scene but in a separate patrol car, went to speak with NC's mother. She informed him that NC was not at home but could probably be found sleeping in an automobile on Gregg Road. Officer Bohn located the automobile and found the appellant, NC, and SF asleep inside. He radioed Officer Sullivan who proceeded to the scene.

The two girls had just exited the appellant's automobile and were with Officer Bohn on the passenger side of the vehicle when Officer Sullivan arrived at the scene. The appellant was still in the driver's seat when Officer Sullivan made contact with him. As he did so, Officer Bohn advised him that he noticed a Wichita County Sheriff's Department badge protruding from under the console lid. Officer Sullivan asked the appellant if he was a peace officer. When the appel-

lant replied that he was not, Officer Sullivan arrested him for possessing the badge in violation of Texas law. The appellant was handcuffed, advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and placed in a patrol car from which he could not exit without police assistance. When Officer Bohn lifted the console lid to retrieve the sheriff's badge, he also found a WFPD hat badge. Officers Bohn and Sullivan then began to search the passenger compartment of the appellant's automobile.

During the course of this search, Officer Bohn found a camera that he believed had been stolen from a WFPD police car the week before and hand tools with the name "Bond" written on the handles. This was of immediate significance to Officer Bohn because the previous day he responded to a vehicle burglary complaint. He recovered from the burglarized vehicle a wire cutter with the name "Bond" on it. Officer Bohn learned that various other items of personal property were taken from the burglarized vehicle, including compact discs, roller blades, and black Adidas sandals. These items were found in the trunk of the appellant's automobile during the warrantless search that followed the appellant's arrest. These stolen items eventually formed the basis of the larceny charge against the appellant.

Based on the officers' search of the passenger compartment of the car, they requested a sergeant be dispatched to the scene. As events unfolded at the scene, their dispatcher informed the officers that both badges were stolen during vehicle burglaries.

Detective Hodges and other officers of the WFPD, including a sergeant, arrived at the scene while the two officers were still searching the passenger compartment. At the time, Detective Hodges was responsible for investigating property crimes. He joined Officers Sullivan and Bohn in the search and almost immediately found a small magnetic key box under the front seat that had been overlooked by Officer Sullivan. He handed the box to Officer Sullivan who opened it and field-tested its contents. The box contained a small amount of marijuana and metham-phetamine. A search of the entire vehicle followed, including the trunk, where officers found stolen property from the previous day's vehicle burglary.

The entire search of the appellant's vehicle took about an hour. It continued after he was in custody and transported to the police station. Prior to transporting the appellant from the scene, Officer Sullivan asked the appellant what he wanted the police to do with his vehicle. His options included locking it and leaving it at the scene or police impoundment. The appellant elected to have the police impound the vehicle. It is standard procedure for the WFPD to inventory impound vehicles.

At trial, the appellant moved to suppress the evidence seized from his automobile as a violation of the Fourth Amendment of the United States Constitution and Military Rules of Evidence. After making findings of fact, which correspond with our recitation set forth above, the military judge denied the motion. He specifically recognized the importance of analyzing the facts as they developed at the scene. He found that the initial search of the passenger compartment of the vehicle was incident to the arrest of the appellant for possession of the sheriff's badge, which was in plain view at the time Officer Bohn observed it, and that the search of the entire vehicle was lawful because it was based on probable cause, which developed during the initial search incident to the appellant's arrest. The appellant now challenges both of these conclusions.

### B. Discussion

The appellant launches a two-pronged attack on the lawfulness of the search of his vehicle. First, he argues that the warrantless search of his trunk was unlawful because it was conducted without probable cause. Second, he argues that Detective Hodges' search of the vehicle was unlawful because it was not conducted contemporaneously with the appellant's arrest and, therefore, was not incident to that arrest. We agree with the appellant that this case raises questions concerning both the lawfulness of a search incident to arrest and the lawfulness of a warrantless search based on probable cause. But we disagree with his assertion that the

conduct of the officers was contrary to well-established Fourth Amendment law.

A military judge's denial of a motion to suppress evidence is reviewed for an abuse of discretion. We review a judge's findings of fact for clear error and his conclusions of law de novo. *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *United States v. Henley,* 48 M.J. 864 (A.F.Ct. Crim.App.1998), *aff'd,* 53 M.J. 488 (C.A.A.F. 2000).

As a starting point, we agree with the military judge that it is necessary to analyze the search of an automobile based on the facts as they unfolded at the scene. This simply acknowledges that the permissible scope of an automobile search is oftentimes, as here, incremental and may change as the search progressed and circumstances change. *See United States v. Fiasconaro,* 315 F.3d 28 (1st Cir.2002). What may start as a search incident to a lawful arrest may quickly develop into a search of the entire vehicle based upon probable cause. The fact that police officers initially lack probable cause to conduct a search of the passenger compartment or lack a search warrant to conduct a probable cause search of the entire vehicle does not vitiate the lawfulness of the search of an automobile.

■ The Fourth Amendment, of course, generally requires that law enforcement personnel obtain a warrant before conducting a search. But there has long been an exception to this requirement for searches of automobiles, the so-called "automobile exception." *Maryland v. Dyson,* 527 U.S. 465, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999). *See California v. Acevedo,* 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) (affirming *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)). Under this exception, police officers may search an entire operable vehicle, including the trunk, without the need to obtain a search warrant, if they have probable cause to believe the vehicle contains contraband. *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). In other words, if the facts would have supported the issuance of a search warrant, the search is lawful even though the police immediately proceed without one. *Id.*

■ Officers may also conduct a contemporaneous search of the passenger compartment of an automobile and any container found therein that is incident to a lawful arrest of the operator or other occupant. *See Thornton v. United States,* 541 U.S. 615, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004) (affirming *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981)). A container "denotes any object capable of holding another object," including "consoles or other receptacle within the passenger compartment." *Belton,* 453 U.S. at 461 n. 4, 101 S.Ct. 2860. In *Belton,* the Supreme Court "sought to set forth a clear rule for police officers and citizens alike." *Thornton,* 541 U.S. at ——, 124 S.Ct. at 2130. When a search is conducted pursuant to *Belton's* bright-line rule, the focus is on the temporal proximity of the search to the arrest and not whether the officers had probable cause to search in the first instance. Wayne R. La-Fave, *Search and Seizure, A Treatise on the Fourth Amendment,* § 7.1(c) (3d ed.1996). Contraband discovered during the search of the passenger compartment or any containers found therein may, however, furnish probable cause to search the entire vehicle. *See United States v. Myers,* 102 F.3d 227, 232 (6th Cir.1996) (search of the trunk and seizure of cash found therein "flowed reasonably and directly from the results of the search of the passenger compartment and the events surrounding the arrest"). Both the search incident to arrest rule and the "automobile exception" to the Fourth Amendment warrant requirement are applicable to courts-martial and have been codified in the Military Rules of Evidence. *See* Mil. R. Evid. 314(g)(2) and 315(g)(3).

■ Contrary to the appellant's arguments, we believe the search of his automobile is properly sustainable on two independent grounds: (1) as a search incident to arrest and (2) as a probable cause search under the "automobile exception." When Officer Bohn approached the appellant's automobile, he observed in plain view what he recognized as a Wichita County sheriff's badge. Officer Bohn informed Officer Sullivan of this fact at the time Officer Sullivan

first engaged the appellant in conversation. Officer Sullivan knew that it was illegal under Texas law to possess such a badge unless the appellant was a law enforcement officer. The appellant's statement that he was not a law enforcement officer provided the officers probable cause to arrest him for possession of the badge. It also gave them, as the military judge held, the authority to search the passenger compartment of his vehicle incident to his arrest, under *Belton* and Mil. R. Evid. 314(g)(2), regardless of whether they had probable cause at that moment to search the vehicle. There simply can be little dispute that this initial search was undertaken in close temporal proximity to the appellant's arrest and was, therefore, contemporaneous with it. *See United States v. Humphrey*, 208 F.3d 1190 (10th Cir.2000) (*Belton* rule was applicable after the appellant had been arrested, handcuffed, and placed in a police car).

■ Here, however, the legality of the officers' actions does not turn on this conclusion alone. What the appellant overlooks is the fact that the same probable cause that justified his arrest also justified the warrantless search of his entire vehicle under the "automobile exception" of Mil. R. Evid. 315(g)(3). In short, before undertaking the search—however characterized—both officers had reason to believe that the appellant possessed stolen property in his vehicle and they also had the authority to seize the sheriff's badge that was in plain view. "The 'plain-view doctrine' allows law enforcement officials conducting a lawful search to seize items in plain view if: 1) they are acting within the scope of their authority, and 2) they have probable cause to believe the item is contraband or evidence of a crime." *United States v. Fogg*, 52 M.J. 144, 149 (C.A.A.F. 1999). The officers' belief that the appellant was in possession of other stolen property was further confirmed when they discovered the WFPD hat badge in the console of the vehicle while seizing the sheriff's badge. Again, there can be little doubt that the console was a "container" as defined by the Supreme Court in *Belton* and subject to search. Probable cause was further established when Officer Bohn discovered tools in the passenger compartment that he immedi-

ately linked to a vehicle burglary that he investigated the previous day. We conclude that the officers clearly had probable cause to search the entire vehicle without a warrant. *See Acevedo*, 500 U.S. at 570, 111 S.Ct. 1982; *Ross*, 456 U.S. at 825, 102 S.Ct. 2157 (if probable cause exists to search a vehicle, the entire vehicle and any container therein may be searched).

■ Finally, the appellant's argument that Detective Hodges' search was unlawful because it was not contemporaneous with his arrest is equally misplaced. When Detective Hodges arrived at the scene, Officers Bohn and Sullivan were actively engaged in the search of the appellant's vehicle. The appellant, though under arrest, in handcuffs, and confined to a locked police vehicle, was still at the scene. A search undertaken at the site of the arrest usually overcomes objections based on temporal proximity and that is the case here. *See United States v. Willis*, 37 F.3d 313 (7th Cir.1994). In *United States v. McLaughlin*, 170 F.3d 889, 891 (9th Cir. 1999), the Ninth Circuit held that a search commencing five minutes after the defendant had been arrested and removed from the scene qualifies as incident to arrest because it "occurred during a continuous series of events closely connected in time to the arrest." To the extent *United States v. Vasey*, 834 F.2d 782 (9th Cir.1987), suggests a different result concerning the contemporaneousness of a search with an arrest, as the appellant argues, we note that *Vasey* is inapposite to the situation at hand. The defendant in that case had been removed from the scene. In any event, the Ninth Circuit later noted that *Vasey* should not be interpreted in such a way as to place it at odds with Supreme Court precedent. *United States v. Lorenzo*, 867 F.2d 561 (9th Cir.1989).

Again, however, we need not rely solely on the conclusion that Detective Hodges' search was in the temporal ambit of the appellant's arrest to find it lawful. At the time he joined the search, Officers Bohn and Sullivan already knew that the vehicle contained stolen property and so Detective Hodges had probable cause to join in the search of the entire vehicle. Detective Hodges' discovery of the

key box in the passenger compartment was just one more incremental development, as events unfolded at the scene, and added to the reasonableness of their belief that the vehicle contained contraband. Under *Belton,* Officer Sullivan's decision to open the key box was also legally permissible, regardless of whether his action is characterized as incident to the appellant's arrest or based upon probable cause. Despite its small size, this key box fit the *Belton* definition of container noted above and was therefore subject to inspection when found. *Belton,* 453 U.S. at 461 n. 4, 101 S.Ct. 2860.

Finally, we note that the appellant voluntarily elected to have the police impound his vehicle. As we stated before, standard WFPD practice is to inventory the contents of impounded vehicles. So, the stolen property would have been located at the time of the inventory and admissible at the appellant's trial. *See generally United States v. Staula,* 80 F.3d 596 (1st Cir.1996) (the Constitution permits a routine inventory examination of impounded vehicles). Thus, in any event, there was a third independent basis to admit the seized items at trial.

The search of the appellant's automobile was lawful under the Fourth Amendment, as well as Mil. R. Evid. 314(g)(2) and 315(g)(3). Accordingly, we hold the military judge did not abuse his discretion in denying the appellant's motion to suppress.

### III. Admissibility of the Confession to AFOSI

#### A. Background

After his arrest, the police officers transported the appellant to the police station for interrogation by Detective Hodges. Two AFOSI agents from Sheppard AFB also went to the police station so that they could question the appellant at the conclusion of Detective Hodges' interview. The AFOSI agents did not participate in the police interview and were not completely aware of what transpired during that interview because they only watched portions of it. Detective Hodges' interview of the appellant was videotaped.

Upon arrival at the station, the appellant was placed in an interview room and advised of his *Miranda* rights. The transcript of the interview reveals what happened next:

Hodges: OK. Jiovanni, the first thing we're gonna [sic] do is your rights OK? I need you [sic] read across that and I'll read it to you.

Torres: Ok, this is telling me uh, waive my rights like . . .

Hodges: Uh, no sir it's not telling you to do anything. OK. Now let me read it to you. You have the right to remain silent and not make any statement at all and any statement you make may be used against you in trial, any statement you make may be used as evidence against you in court, you have a right to have a lawyer present to advise you to [sic] prior to and during questioning; if you are unable to employ a lawyer, you have the right to have a lawyer appointed to advise you prior to and during any questioning; you have the right at anytime to terminate the interview and not make any statements. And you understand all that?

Torres: Yes.

Hodges: This isn't telling you to waive your rights . . .

Torres: Um Hmm.

Hodges: This is just saying that you do understand your rights?

Torres: OK.

Hodges: Alright. I need you to sign it right here and date it, just saying that you do understand your rights is all that says. OK?

Torres: OK. How come it says do hereby this date waive my rights voluntarily without duress and, it says waiving, that I'm agreeing to waive my rights?

Hodges: No sir, it's not what it's saying. What it's saying by signing it is that you do understand your rights. You're not waiving your rights to anything. OK? Like the last one right here says, you have the right at anytime to terminate this, this interview and not make any statement OK?

Torres: Um hmm.

Hodges: That's all it says.

Torres: Oh OK.

Hodges: The only reason you are signing it is saying that you do understand your rights. OK.

Torres: OK. I do understand. OK.

Hodges: OK. Now Jiovanni, having having [sic] your rights in mind, do you wish to make a statement or answer any questions?

Torres: *No.*

Hodges: No?

Torres: *No.*

Hodges: OK. Do you understand that when all those girls were talking real well out there, should [sic] you hear the whole side of the story?

Torres: I guess, I don't know.

Hodges: You don't know?

Torres: I was sitting in the cop car, I couldn't tell whether she was talking or not.

Hodges: Yeah? OK. Were you involved in any of those vehicle burglaries?

Torres: *Um, I am not saying anything right now.*

(Emphasis added).

Detective Hodges continued to question the appellant without pause after he thrice asserted his right to remain silent. He also decided that he would "explain to [the appellant] what we can do here." This explanation included both the benefits of cooperation and the disadvantages of remaining uncooperative. Specifically, Detective Hodges told the appellant immediately after he invoked his right to remain silent that if he cooperated, he would combine the burglary charge into one charge, but that if he did not cooperate, he would multiply the charges against the appellant by filing them "one at a time" because the appellant would be making him do things the "hard way." Thus informed, the appellant cooperated in an interrogation that lasted about one and one-half hours. This interrogation focused mainly on the car burglaries but it also, as the military judge found, included questions about the appel-

lant's drug use and distribution and inappropriate relationships.

At the conclusion of Detective Hodges' interview, the appellant was immediately turned over to the AFOSI agents for their interview. This interview was conducted by two AFOSI agents at the same police station, but in a different room, and started about 12 minutes after Detective Hodges' interview concluded. The agents advised the appellant of his Article 31, UCMJ, rights, which he waived, and then questioned him about the AWOL offense, larceny, drug offenses, and inappropriate relationships.[2] The agents did not provide him with a cleansing warning because they did not know the appellant had previously invoked his Fifth Amendment right against self-incrimination during the WFPD interview and that Detective Hodges had ignored this invocation. The appellant confessed to using marijuana and methamphetamine and to providing the latter drug to the two minors, NC and SF, who were with him at the time of his arrest.

At trial, the appellant moved to suppress both the statement made to Detective Hodges and the statement made to the AFOSI agents. During the motion hearing, Detective Hodges explained that he continued to question the appellant after he invoked his right against self-incrimination because, in his view, *Miranda* permitted such continued questioning. As he explained, "Until they tell me they want a lawyer, I don't have to quit asking them questions, and even then I do not have to quit asking them questions."

The military judge suppressed the appellant's statement to Detective Hodges. He specifically found that the accused invoked his right to remain silent and that Detective Hodges continued to question him afterwards. He declined, however, to suppress the appellant's statement to the AFOSI agents because he found that, under the totality of the circumstances, the statement was voluntary. Specifically, he found, inter alia, that the two agencies were working separately and that the information elicited

---

2. The appellant was also questioned about an alleged sexual assault occurring in March 2001. This offense was not before the court-martial. The AFOSI agents had questioned the appellant in February 2001 about the charged indecent act offense and the appellant had made an incriminatory statement at the time about that offense.

from the appellant by the AFOSI agents was independently obtained. The military judge made no specific findings as to whether the appellant's statement was involuntary as a result of a technical violation of *Miranda* or because it was taken in violation of the Fifth Amendment itself. Before this Court, the government argues the military judge "clearly found" the appellant's statement to Detective Hodges was not the result of actual coercion. We believe this is a fair reading of the military judge's findings. And we conclude this was error.

## B. Discussion

The question whether a confession is voluntary is a legal question requiring our independent determination. *United States v. Ford*, 51 M.J. 445 (C.A.A.F.1999). We rely on the military judge's findings of fact to the extent that they are not clearly erroneous. *Id.* Although our concern is the admissibility of the appellant's second statement, we have set out in detail the circumstances surrounding the appellant's first statement, though suppressed, because that is the starting point for our independent determination of whether the second statement was voluntary. If the appellant's first statement was involuntary only because of a technical violation of *Miranda*, then his second statement was, as the military judge found, untainted by Detective Hodges' actions and admissible so long as it was voluntary under the totality of the circumstances. On the other hand, if the first statement was involuntary because it was the product of actual coercion, duress, or unlawful inducement, then the second statement is presumptively tainted, and is admissible only if the government proved by a preponderance of the evidence that this taint was sufficiently attenuated at the time the statement was made. *See Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *United States v. Benner*, 57 M.J. 210 (C.A.A.F.2002); *United States v. Phillips*, 32 M.J. 76 (C.M.A.1991).

The first question we must resolve is whether the appellant's statement to Detective Hodges was rendered involuntary solely because of a technical violation of *Miranda*, and was otherwise voluntary, as the government argues, or whether it was involuntary because of an actual violation of the Constitution as the appellant argues. The military judge did not make either express findings of fact or conclusions of law on this issue. That is, he never addressed the question of presumptive taint resulting from the appellant's confession to Detective Hodges. But, we surmise from his ruling, and the government's argument to this Court, that he viewed the violation as simply a technical rights violation, leaving the appellant's statement to Detective Hodges otherwise voluntary. The government argues in their brief that the military judge's ruling is correct "because there is no evidence that this statement was taken as a result of actual coercion or duress." Citing *Elstad*, they argue the Article 31, UCMJ, rights advisement given by the AFOSI agents before the second interview was sufficient to cure any error and render the second statement admissible.

We are not persuaded by this argument. To begin with, it is in conflict with one of the examples cited by the Supreme Court in *Elstad* to illustrate the distinction between the two classes of involuntary statements. *Elstad*, 470 U.S. at 313, 105 S.Ct. 1285. "Likewise inapposite are the cases the dissent cites concerning suspects whose invocation of their rights to remain silent and to have counsel present were flatly ignored while police subjected them to continued interrogation." *Id.* at 314 n. 3, 105 S.Ct. 1285 (citing *United States ex rel. Sanders v. Rowe*, 460 F.Supp. 1128 (N.D.Ill.1978); *People v. Braeseke*, 25 Cal.3d 691, 159 Cal.Rptr. 684, 602 P.2d 384 (1979); *vacated on other grounds, California v. Braeseke*, 446 U.S. 932, 100 S.Ct. 2147, 64 L.Ed.2d 784 (1980); *Smith v. State*, 132 Ga.App. 491, 208 S.E.2d 351 (1974)).

In *Elstad*, the accused made an initial incriminating statement before being advised of his *Miranda* rights. An hour later he was advised of and waived his rights and made a written confession. *Id.* The Supreme Court noted that because *Miranda* sweeps broader than the constitutional protection itself and creates a conclusive presumption of involuntariness, it requires the exclusion of unwarned statements that are otherwise voluntary. *Id.* at 307, 105 S.Ct. 1285. *Accord*

*Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (Congress could not legislatively overrule *Miranda* because *Miranda* was a constitutional decision and not simply a prophylactic rule). But the Court went on to state that when police conduct actually infringes on the Fifth Amendment itself, a far different situation is presented, and the government's task in securing admission of a second statement, made after such a violation, is a far more difficult task. *Elstad,* 470 U.S. at 312–14, 105 S.Ct. 1285. "When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Id.* at 310, 105 S.Ct. 1285.

In this case, we find that Detective Hodges' interrogation did not simply entail a failure to properly advise the appellant of his rights under *Miranda,* but was deliberately coercive and improper. And it resulted in a violation of the appellant's Fifth Amendment right to remain silent. When a suspect who is in custody invokes his Fifth Amendment right to remain silent during questioning, the police must scrupulously honor that right and immediately cease their questioning of the individual. *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). "At this point [the suspect] has shown he intends to exercise his Fifth Amendment privilege; any statement taken after the [suspect] invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Id.* at 101, 96 S.Ct. 321 (quoting *Miranda,* 384 U.S. at 473–74, 86 S.Ct. 1602). While we agree with the military judge's observation that the police may reengage a suspect who has invoked his right to remain silent, this presupposes that the police "scrupulously honored" his right to cut off questioning in the first instances. *United States v. Watkins,* 34 M.J. 344 (C.M.A.1992). In our view, the ability of the police to "reengage" a suspect who has invoked his or her right to remain silent is irrelevant if the police never stopped their questioning as required by the Constitution. Here, Detective Hodges not only ignored this important safeguard but immediately sought to undermine the appel-

lant's decision by explaining the consequences of making the police do the investigation the "hard way." Indeed, we are struck by how closely this scenario resembles the example of actual coercion noted by the Supreme Court in *Elstad* and quoted above. Detective Hodges flatly ignored the appellant's invocation of his Fifth Amendment right and continued questioning based on his unreasonable belief that *Miranda* allowed him to do so.

■ Under the circumstances, we have no difficulty finding that the appellant's first statement was not a technical violation of *Miranda's* warnings but the product of deliberate coercion and improper tactics. This, in our view, leads to the further conclusion that his second statement was presumptively tainted. *Benner,* 57 M.J. at 213. But this does not end our inquiry. We must, as the appellant suggests in his brief, apply the taint analysis of *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), to determine whether this presumptive taint requires exclusion of the second statement. Under *Brown* and *Elstad,* we look to the temporal proximity of the coercive conduct to the second confession, the presence of intervening circumstances attenuating the coercive effects of the police misconduct, and the nature of the misconduct to determine whether the taint carried over to the second statement.

The government did not meet its burden to prove lack of taint. Indeed, it has never even acknowledged—at trial or before this Court—the possibility that the second statement was presumptively tainted. Thus, we are left with only the appellant's argument on the issue, and we are persuaded by that argument.

First, it is clear beyond cavil that there was close temporal proximity of Detective Hodges' violation of the appellant's constitutional rights and the second statement. The appellant was immediately turned over to AFOSI agents for interrogation at the conclusion of Detective Hodges' interrogation. Within a span of minutes, AFOSI agents were questioning the appellant in what was almost a continuous interrogation from the

time he invoked his rights. Second, both interrogations occurred at the same location, although in different rooms. Third, we find the nature of Detective Hodges' violation to be flagrant. It has been 38 years since the Supreme Court decided *Miranda*. The purpose of the decision was to lay down "concrete constitutional guidelines for law enforcement agencies and courts to follow." *Dickerson*, 530 U.S. at 435, 120 S.Ct. 2326 (quoting *Miranda*, 384 U.S. at 442, 86 S.Ct. 1602). At best, we find it patently unreasonable for a police detective to believe that he could flatly ignore well-established law. And at worst, Detective Hodges' conduct was a deliberate violation of the law by someone who has sworn to uphold it. *See Arizona v. Fulminante*, 499 U.S. 279, 293, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (there is a "deep-rooted feeling that the police must obey the law while enforcing the law").

On the other hand, the factors that work in the government's favor are the change of interrogators from the civilian police to the AFOSI agents, the second rights advisement—albeit without a cleansing statement—and the change in focus of the subject matter of the second interrogation. Ultimately, however, we are satisfied that these factors are not enough to carry the day for the government in overcoming what *Elstad* referred to as the "irremediable consequences" caused by Detective Hodges' violation of the appellant's constitutional rights. *Elstad*, 470 U.S. at 309, 105 S.Ct. 1285.

In reaching this conclusion, we are aware that the AFOSI agents were not responsible for Detective Hodges' misconduct and we cast no aspersions on them. But our focus is not on the AFOSI but on the effect the constitutional violation had on the appellant. In light of the temporal proximity of the two interrogations and the fact that the appellant was never given the respite to which he was constitutionally entitled, we find the government failed to successfully overcome the consequences of a violation of the appellant's Fifth Amendment privilege against self-incrimination. Accordingly, we find it was er-

ror to admit the appellant's confession to the AFOSI.

■ Our final task is to remedy this violation, if we can. The admission of a coerced confession is subject to harmless-error analysis. *See Fulminante*. We must be convinced beyond a reasonable doubt that the appellant's statement did not contribute to his conviction on the two specifications charging distribution of methamphetamine.[3] *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We cannot reach that conclusion based on the remaining evidence.

> A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.... The admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct...."

*Fulminante*, 499 U.S. at 296, 111 S.Ct. 1246 (quoting *Bruton v. United States*, 391 U.S. 123, 139–40, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (White, J., dissenting)). When the appellant's confession is removed from the equation of guilt, we are left with the testimony of two drug-abusing juvenile delinquents, NC and SF, with whom the appellant shared methamphetamine during the course of his own use. While the testimony of these girls might alone have been enough to convince a factfinder of the appellant's guilt of the offenses beyond a reasonable doubt, we cannot say that their testimony is so credible or so overwhelming that the appellant's confession did not contribute to his conviction for distributing methamphetamine to them.

Accordingly, the findings of guilty to Specifications 1 and 2 of Charge II cannot be affirmed. We will grant relief in our decretal paragraph.

### IV. Speedy Trial

The appellant argues that he was denied a speedy trial under R.C.M. 707(a) because he was not brought to trial within 120 days of being placed in pretrial confinement. He

---

3. Our decision does not affect the remaining findings of guilty. The appellant's guilty pleas waived the issue in respect to the use offenses to which he pleaded guilty. R.C.M. 905(e). The confession does not affect the AWOL or larceny offenses.

also argues that his rights under Article 10, UCMJ, and the Sixth Amendment to the United States Constitution were also violated. We find that the appellant has waived this issue in respect to the offenses to which he pleaded guilty. *United States v. Birge*, 52 M.J. 209 (C.A.A.F.1999). We will, however, consider the issue in respect to the remaining charges. The military judge found that: (1) The R.C.M. 707 clock began to run on 21 May 2001 when the Wichita County District Attorney dismissed the state's charges; (2) The appellant was brought to trial within 106 days of that date; and (3) Considering all the circumstances of the case prior to trial, including reasons for delay, the government acted with reasonable diligence in bringing the case to trial. After carefully considering the record and the briefs of the parties, we find no basis to disturb the military judge's ruling. *Birge; United States v. Kossman*, 38 M.J. 258 (C.M.A.1993).

*V. Relief and Reassessment of Sentence*

Having determined that it was error to admit the appellant's confession to AFOSI agents, we must decide what action to take with respect to Specifications 1 and 2 of Charge II and the sentence. We can order the record returned to the convening authority for a rehearing on the two specifications and sentence, or if a rehearing on the two specifications is not practical, a rehearing just on sentence for the remaining charges and specifications. Our other option is simply to dismiss the two affected specifications in the interest of judicial economy and reassess the sentence consistent with the principles of *United States v. Peoples*, 29 M.J. 426 (C.M.A.1990) and *United States v. Sales*, 22 M.J. 305 (C.M.A.1986). We believe the latter course of action adequately serves the ends of justice.

It has been more than three years since the appellant committed the offenses and just short of three years since his trial. Even without retrial on these two distribution specifications, the appellant will stand convicted of serious criminal offenses, including AWOL, use of marijuana and methamphetamine, larceny, and committing an indecent act with a child. Moreover, even if we were to remand this case, as a practical matter, the appellant will already have served his sentence to confinement. The question remains whether we can determine beyond a reasonable doubt that the appellant's sentence would have been at least of a certain magnitude without the prejudicial effects of the error. *See Peoples; Sales.* We believe we can.

The dismissed specifications carry the longest period of confinement of all the offenses in this case. Their dismissal results in a reduction of the maximum confinement by 30 years. Although a change in the maximum authorized confinement of this magnitude may give us pause in reassessing the sentence in some circumstances, it does not do so here for several reasons. First, this was a military judge alone trial and it is likely that, in fashioning a sentence, the military judge was more influenced by the circumstances of each offense than by the individual maximum punishments for each. The trial counsel argued for a ten-year sentence, which is less than the maximum confinement authorized after dismissal of the two distribution specifications. Despite this request, the military judge sentenced the appellant to only 42 months of confinement. Second, we believe the circumstances surrounding the appellant's distributions of methamphetamine to NC and SF would have been before the court during sentencing regardless of whether or not he was charged with these offenses. Both of these distributions occurred at the same time and were contemporaneous with the appellant's own use of the drug to which he pleaded guilty. So, charged or not, his actions in providing the drugs to the girls would almost certainly have been presented by the government as evidence directly related to his own use under R.C.M. 1001(b)(4). *See generally United States v. Mullens*, 29 M.J. 398 (C.M.A.1990). Thus, even without these offenses, the sentencing evidence before the court would not have changed much.

Under the circumstances, we conclude beyond a reasonable doubt that the sentence for the remaining offenses would have been at least of a magnitude of a bad-conduct discharge, confinement for 30 months, and reduction to E–1.

 

### VI.  Conclusion

The approved findings of guilty as to Specifications 1 and 2 of Charge II are set aside and dismissed.  The remaining findings of guilty and only so much of the sentence as provides for a bad-conduct discharge, confinement for 30 months, and reduction to E–1 are approved.  The findings, as modified, and the sentence, as reassessed, are correct in law and fact and no error prejudicial to the substantial rights of the appellant occurred.

Article 66(c), UCMJ.  *United States v. Reed,* 54 M.J. 37, 41 (2000).  Accordingly, the approved findings and sentence are

AFFIRMED.