UNITED STATES, Appellee,

v.

David R. FORD, Specialist,
U.S. Army, Appellant.

No. 98–0855.
Crim.App. No. 9601467.

U.S. Court of Appeals for
the Armed Forces.

Argued April 7, 1999.

Decided Sept. 23, 1999.

GIERKE, J., delivered the opinion of the Court, in which COX, C.J., and SULLIVAN, CRAWFORD, and EFFRON, JJ., joined. SULLIVAN, J., filed a concurring opinion.

For Appellant: *Captain Joshua E. Braunstein* (argued); *Colonel John T. Phelps, II, Lieutenant Colonel Adele H. Odegard,* and *Captain Kirsten V. Campbell–Brunson* (on brief); *Captain Arden B. Levy.*

For Appellee: *Captain Mary E. Braisted* (argued); *Colonel Russell S. Estey* and *Lieutenant Colonel Eugene R. Milhizer* (on brief).

Judge GIERKE delivered the opinion of the Court.

A military judge sitting as a general court-martial convicted appellant, pursuant to his pleas, of violating a lawful general regulation by possessing an M22 TOW missile simulator, in violation of Article 92, Uniform Code of Military Justice, 10 USC § 892. He also convicted appellant, contrary to his pleas, of possessing an explosive device in violation of a lawful general regulation, possessing an unregistered firearm, and unlaw-

fully making a firearm, in violation of Article 92, and Article 134, UCMJ, 10 USC § 934.[1] The adjudged and approved sentence provides for a bad-conduct discharge, confinement for 120 days, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed without opinion.

This Court granted review of the following issues:

I

WHETHER THE GOVERNMENT FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT [SPECIALIST (SPC) FORD] DID NOT INVOKE HIS RIGHT TO COUNSEL AFTER AN ILLEGAL INTERROGATION, AND WHETHER THE SUBSEQUENT STATEMENT [SPC FORD] GAVE TO CID WAS TAINTED, AND THEREFORE INADMISSIBLE BASED ON THE TOTALITY OF THE CIRCUMSTANCES, AND WAS PREJUDICIAL TO [SPC FORD].

II

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN HE DENIED [SPC FORD]'S REQUEST FOR A DEFENSE EXPERT ON EXPLOSIVES DESPITE THE BIAS OF THE GOVERNMENT EXPERTS, AND THAT DENIAL PREJUDICED [SPC FORD].

For the reasons set out below, we affirm.

*Issue I: Invocation of Right to Counsel*

*Factual Background*

On April 11, 1996, Special Agent (SA) Conner was the on-call duty agent for the local field office of the Criminal Investigation Command (CID). He was notified that a soldier had discharged a weapon in a barracks room, and he went to the scene to investigate. While he was investigating, he overheard "an MP" say that a bomb or explosive device had been found in a different module of the barracks.

SA Conner went to the other module, where he found a health and welfare inspection in progress. In a common area of the barracks, he saw "some electrical cables, some books, an improvised explosive device, pyrotechnics in a can, Gatorade bottle containing what they thought was fertilizer." Captain (CPT) Abbott, the company commander, told SA Conner that the items belonged to appellant. SA Conner asked appellant for some personal data and asked him "if the stuff was dangerous, what is it, how long he had it." SA Conner testified that appellant asked "what his rights were," and he told appellant "that he didn't have to talk to" him. According to SA Conner, "[w]e then mutually ceased the interview." SA Conner testified that appellant did not "request an attorney" or "mention a lawyer."

Staff Sergeant (SSGT) Gaddy was present during the health and welfare inspection. He heard SA Conner questioning appellant. When the CID agent stopped questioning appellant "for a few minutes," appellant asked SSGT Gaddy if he "thought he needed an attorney present or should he answer the questions." SSGT Gaddy told appellant that "it was up to him, that [he] wasn't going to tell him what to do at the time." He testified that appellant "went back over"; the CID agent "asked him a couple of more questions," appellant "asked to have a lawyer present, or to talk to a lawyer," and the CID agent stopped the questioning.

CPT Abbott testified that appellant was not advised of his rights in the barracks, but that he inquired about his rights. He did not remember appellant asking for an attorney.

Appellant did not testify concerning his conversation with SA Connor in the barracks.

Appellant was transported from the barracks to the CID office, where he was placed in an interview room. This room was de-

1. The offenses of possessing an unregistered firearm and making a firearm were alleged to be violations of 26 USC § 5861(d) and 26 USC § 5861(f), respectively, and were charged as violations of clause 3 of Article 134, which assimilates all "crimes and offenses not capital" into Article 134.

scribed as being about 8 feet by 10 feet with a one-way mirror on one wall. SA Sinclair testified that he questioned appellant to obtain essential identifying data. SA Sinclair did not warn appellant of his rights at that time. At some point Sinclair learned that appellant was from Texas, and used the fact that he was also from Texas to establish some rapport with appellant. After SA Sinclair obtained some identifying information from appellant, they conversed about Texas and appellant's plans for the future. Also, during that conversation, SA Sinclair asked appellant about the Free Men and what appellant thought about the Bureau of Alcohol, Tobacco, and Firearms. SA Sinclair estimated that this process took about 15–20 minutes. Appellant testified that he believed this interview lasted about one hour.

SA Conner then entered the room and advised appellant of his rights. SA Conner testified that this second interview with appellant was about 45 minutes after the conversation at the company barracks. There is no evidence that SA Conner advised appellant that the information he had provided earlier could not be used against him, and trial counsel conceded that no such "cleansing statement" was made. Appellant waived his rights and made an inculpatory statement. Appellant told SA Conner how he learned to make the devices, how he ordered parts, when he made the item in question, and the length of time the item was in his locker.

During the interrogation, appellant said that he had kept the items in his locker for a considerable time. Another agent had found several receipts in appellant's room and SA Connor believed that they showed that appellant had purchased several of the items within the preceding month or so. SA Conner accused appellant of lying about the date of purchase. This led appellant to mention an attorney. SA Conner testified as follows:

Q. [TC]: At any time during the questioning, did you stop the questioning?

A. [SA Conner]: In what respect, sir?

Q. Did you stop questioning him for any reason during the questioning?

A. There was one period where we had ceased questioning [sic] of the interview.

Q. Why was that?

A. After the other agent came back from searching [appellant's] room, he had found some receipts from Radio Shack in Hinesville, and on the receipts it appeared that the items were purchased in March of this year. So, I questioned [appellant] about, you know, "I thought you'd been honest with me here so far," and he said "Yeah." I said, "You've had this stuff here for a long time," you know. "Here, we find receipts that you were out there shopping last month," you know. "What's the deal?" So, we questioned that. It was later determined that, upon viewing the original receipt, the receipt was dated 1995, not 1996. The photocopy had made the "5" appear to be a "6."

Q. So, you thought he was lying to you?

A. Yes, sir. And it was during the course of that conversation pertaining to the receipts that Specialist Ford had said something like, "I don't want to talk to you anymore. Maybe I should get a lawyer" or something. So I stopped asking the incriminating questions and then I looked at him, and after I looked at him, I said, "Well, what are we going to do? Are we going to continue the interview or do you want to stop and get a lawyer?" He said, "Well, are you going to continue accusing me of lying?", and I said, "Well, if you're talking about the receipts, we have clarified this issue, that it was 1995 and not 1996, as I originally thought," and "No, I do not still think you're lying about that receipt." He said, "Well then, I guess I'll go ahead and continue to speak with you about this."

Q. And did he do so?

A. Yes, sir, he did.

Appellant's recollection of that portion of the interview was somewhat different:

Q. [DC] When Agent Conner was asking you questions, did he ask you questions of the same nature that he was asking you up in the barracks?

A. [Appellant] I believe so. Some of them were. I don't remember exactly how

all things went on it, but a lot of the questions were the same throughout.

Q. And then it switched to questions about the Radio Shack and where you bought wires?

A. Yes, yes.

Q. Had he asked you that beforehand, in the barracks?

A. I really don't remember. I remember him asking me about where I came from and ... I really don't remember those questions being asked.

Q. When he started asking you about the Radio Shack stuff, what happened?

A. He came in and started accusing me of lying, after the other CID agent had brought the receipts to him. He started saying that I was lying, that I had just bought the stuff, you know, and so I was like, "Okay, I'm tired of playing your games. I want a lawyer." I'm sure I said it several times, because he kept, you know, saying stuff, and I said, "Well, I want a lawyer." And then he—I don't know, something went on and I said, "Let me see the receipts," and that's when he showed me copies of the receipts. I said, "I want to see the originals," and that's when he pulled out the originals and showed me the originals that had the actual dates on it that you could read.

Q. What did they say?

A. They said March of '95 instead of March of '96. He was trying to say that I'd bought the stuff in March of—

Q. And then after you—when you requested a lawyer, did you say maybe you should or did you tell him that you definitely wanted one?

A. No, I said, "I want a lawyer," and I said, "I'm tired of playing games. I want a lawyer."

Q. And then he looked at the Radio Shack receipt and it proved you right. Who made the next step?

A. He asked me if I still wanted a lawyer, and that's when I said, uh—and he said something about he didn't like being lied to, and I said, "Well, I don't like being called a liar. I've been trying to answer your questions as honestly as I can." He

said, "Do you still want a lawyer?" and I said, "Well, if you're not going to call me a liar any more, you know, and do what you've been doing, then I will answer your questions, but ... "

Q. So when you first asked for a lawyer, he didn't give you an opportunity to call one?

A. Exactly.

On cross-examination, trial counsel asked appellant if he was "willing to go ahead and answer questions" after the issue about the date on the receipts was resolved. Appellant responded:

That's correct, because he said there was going to be no more problems out of it and I said okay. Like I told him earlier, that I—he said that he didn't like being lied to and I said that I didn't like being called a liar, because I had answered his questions honestly. I said, "Are you going to be calling me a liar anymore on the stuff that I'm talking about here?" and he said, "No," and I said, "Well, I guess I don't need a lawyer then."

Trial counsel asked, "So, you were willing at that point to just keep answering questions, right?" Appellant responded, "Yes."

At trial, the defense moved to suppress appellant's oral statements made in the barracks and the written statement executed at the CID office. The military judge suppressed the oral statement made in the barracks, but denied the defense motion to suppress the written statement.

The military judge suppressed the barracks statement by virtue of its unwarned character, but he determined that the request for counsel was not made in the barracks, but rather, that appellant only asked, "What are my rights?" The military judge also found that appellant did not invoke his right to counsel at the CID office, but instead he made an ambiguous reference to counsel. He also ruled that the first inadmissible statement made in the barracks did not taint the second statement given to the CID.

To support his ruling, the military judge made the following findings:

I find that the accused did not make an unequivocal request for an attorney. Second, that the accused did reopen dialogue with the agents. He did express a willingness and a desire for further discussion about the subject of the interrogation. Specifically, I find that the accused made a statement to the effect, "If you're going to play games, I want an attorney" or "If you call me a liar, I want an attorney," or words to that effect; both of those, in my view, are not unequivocal, because they are proceeded by that conditional "if."

I find, further, that the accused reinitiated conversation with the Criminal Investigation Division [sic], stating something to the effect—and I reviewed the testimony of Special Agent Michael Connor and Specialist Ford—that, "As long as you are not calling me a liar anymore, then I don't need an attorney," or something to the effect, "Are you going to be calling me a liar anymore?" Response, "No," and "Then I guess I don't need a lawyer." Also, a statement to the effect, "Are you going to accuse me of lying anymore?"; response, "No," and "Then I don't need a lawyer," or "If you are not going to call me a liar, then I will answer your questions." In my view, those responses characterize what took place and, thereby, the accused did reinitiate conversation.

I find that the accused was willing and did desire further discussion about the subject, and he did voluntarily proceed without an attorney.

### Discussion

Appellant asserts that the Government failed to prove by a preponderance of the evidence that his written confession was voluntary. He argues that the military judge's findings that he did not invoke his right to counsel in the barracks and later at the CID office were clearly erroneous. The Government asserts that appellant did not make an unequivocal request for an attorney at any time.

If, as in this case, the defense objects to admissibility of a confession, "the prosecution has the burden of establishing . . . admissibility." Mil.R.Evid. 304(e), Manual for Courts-Martial, United States (1995 edition).[2] Before a confession may be admitted, "[t]he military judge must find by a preponderance of the evidence" that the confession was voluntary. Mil.R.Evid. 304(e)(1). A confession "that is challenged . . . as derivative evidence may be admitted . . . if the military judge finds by a preponderance of the evidence that the [derivative confession] was made voluntarily, that the [confession] was not obtained by use of the [inadmissible evidence,] or that the confession would have been obtained even if the [inadmissible statement] had not been made." Mil.R.Evid. 304(e)(3); see United States v. Murphy, 39 MJ 486, 488 (CMA) ("crucial issue . . . is not whether the consent was a fruit of the inadmissible statement but rather, . . . whether the 'later confession' was voluntary"), cert. denied, 513 U.S. 1019, 115 S.Ct. 582, 130 L.Ed.2d 497 (1994).

In United States v. Phillips, 32 MJ 76 (1991), and United States v. Steward, 31 MJ 259 (1990), this Court applied the Supreme Court's analysis in Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), to determine if a subsequent confession was tainted by a previous unwarned confession. In Phillips, this Court explained:

> Where a confession is obtained at a lawful interrogation that comes after an earlier interrogation in which a confession was obtained due to *actual* coercion, duress, or inducement, the subsequent confession is presumptively tainted as a product of the earlier one. On the other hand, where the earlier confession was "involuntary" only because the suspect had not been properly warned of his panoply of rights to silence and to counsel, the voluntariness of the second confession is determined by the totality of the circumstances. The earlier, unwarned statement is a factor in this total

---

**2.** All Manual provisions are cited to the version applicable at trial. The 1998 version is un-

changed, unless otherwise indicated.

picture, but it does not presumptively taint the subsequent confession.

32 MJ at 79.

▪ An assessment of "the totality of all the surrounding circumstances" includes "both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The Supreme Court has described the test for actual coercion as follows:

Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) (opinion of Frankfurter, J.). In *Elstad*, the Supreme Court stated: "A subsequent administration of *Miranda* [384 U.S. 436, 444, 86 S.Ct. 1602 (1966) ] warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." 470 U.S. at 314, 105 S.Ct. 1285, quoted in *Murphy*, 39 MJ at 488, and *United States v. Young*, 49 MJ 265, 267 (1998). Thus, "[t]he necessary inquiry is whether the confession is the product of an essentially free and unconstrained choice by its maker." *United States v. Bubonics*, 45 MJ 93, 95 (1996). If there has been an earlier unwarned statement, "the absence of a 'cleansing' warning before the subsequent statement" is one of the "circumstances to be considered in determining voluntariness." *United States v. Lichtenhan*, 40 MJ 466, 470 (CMA 1994).

▪ Interrogation of a suspect in custody must cease if the suspect requests counsel. Mil.R.Evid. 305(f)(2). An ambiguous comment or request, however, does not require that interrogation cease. A request for counsel must be articulated "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." If the men-

tion of an attorney "fails to meet the requisite level of clarity," questioning may continue. "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Davis v. United States*, 512 U.S. 452, 459, 461–62, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

The Supreme Court has recognized that "it will often be good police practice for the interviewing officers to clarify whether or not [a suspect] actually wants an attorney." *Davis, supra* at 461, 114 S.Ct. 2350. "There is no blanket prohibition against a comment or a statement by a police officer after an invocation of rights." *Young*, 49 MJ at 267.

▪ The military judge's determination that a confession is voluntary is a question of law, requiring independent, *i.e., de novo*, review. *Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302 (1991); *Bubonics, supra* at 94. When a military judge makes special findings of fact, they are the basis for our review of the question of voluntariness, unless clearly erroneous. *United States v. Cottrill*, 45 MJ 485, 488 (1997).

Applying the foregoing principles, we hold that appellant's written confession was voluntary and admissible. Because appellant did not testify about the barracks interview, the military judge had only the testimony of SSgt Gaddy, who testified that appellant asked for a lawyer; SA Conner, who testified that appellant did not "mention a lawyer"; and CPT Abbott, who testified that he did not remember appellant asking for a lawyer. The military judge found that appellant did not ask for a lawyer during the barracks interview. The testimony of SA Conner and CPT Abbott was sufficient to meet the requirement for proof by a preponderance of the evidence. Because the military judge's finding was not clearly erroneous, it is the factual basis for our review of voluntariness. Based on the military judge's finding that appellant did not request a lawyer during the barracks interview, we need not address the question whether SA Connor improperly reinitiated interrogation at the CID office

after appellant invoked his right to counsel in the barracks.

Two issues remain: (1) was appellant's confession at the CID office voluntary in spite of the unwarned questioning in the barracks; and (2) did appellant invoke his right to counsel at the CID office? We answer the first question in the affirmative and the second in the negative.

■ Based on the totality of the circumstances, we hold that appellant's written confession was voluntary. The barracks interview, although unwarned, was not the product of coercion. It was conducted in an open area of the barracks, with other unit personnel moving around. SA Conner questioned appellant in a casual environment while talking to others, including CPT Abbott, at the same time. Although appellant was not free to leave the area, he was free to move around and talk to others, as evidenced by his conversation with SSgt Gaddy. SA Conner terminated the conversation when appellant asked about his rights.

■ Appellant conceded at trial that he was properly warned of his rights at the CID office. While being interrogated in the "station house" is somewhat coercive in itself, there is no evidence that appellant was deprived of food, water, or other personal comforts. He was not questioned at great length to wear him down physically. While no "cleansing warning" was given, appellant appeared to understand his rights and freely waived them. When he became irritated at SA Connor, he threatened to invoke them. Finally, there was no reference to the earlier unwarned statements at the barracks. Thus, after examining the totality of the circumstances, we hold that the written confession was voluntary.

■ The only contested issue regarding appellant's written confession was whether he invoked his right to counsel. SA Connor testified that after he accused appellant of lying about the date on which he purchased the materials found in his locker, appellant said, "Maybe I should get a lawyer," or something similar. SA Conner testified that he stopped the interrogation, waited a few minutes, and asked, "Are we going to continue the interview or do you want to stop and get a lawyer?"

On the other hand, appellant testified he said, "I want a lawyer." Appellant admitted, however, that when SA Connor examined the receipt ·and admitted that he had been mistaken, appellant told him that he would continue answering questions without a lawyer if SA Conner would stop calling him a liar. Appellant testified that he responded to SA Conner's question, "Do you still want a lawyer?" by stating, "Well, if you're not going to call me a liar anymore ... then I will answer your questions." The context of the conversation, understood by both SA Conner and appellant, was that appellant would not talk to SA Conner if he persisted in calling him a liar, but that appellant was willing to talk if SA Conner acknowledged that he had been mistaken about the date on the receipt and stopped calling him a liar. Under the circumstances, we hold that appellant's invocation was ambiguous, conditioned on not being called a liar. It was not articulated "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Accordingly, we hold that SA Connor was not required to terminate the interview and thus the written confession was admissible.

### Issue II: Expert Assistance

#### Factual Background

The defense theory was that the device seized from appellant's locker was not a "firearm," as defined by 26 USC § 5845(a)(8) and (f). The statutory definition of "firearm" includes any "destructive device." The defense argued that the device was not a "destructive device" but merely a firecracker designed for entertainment. On the other hand, the prosecution theory was that the device was a "bomb."

During a session under RCM 802, Manual, *supra*, defense counsel informed the military judge that he had interviewed Anthony May, a government explosives expert employed by the Bureau of Alcohol, Tobacco, and Firearms (ATF). Defense counsel was not satisfied at that time that Mr. May could answer

all his questions. When it appeared that defense counsel's questions pertained more to chemistry than explosives, the Government informed the military judge that it intended to make its forensic chemist, David Flohr, available to the defense. Conceding that Mr. Flohr might be able to answer his questions, defense counsel received permission from the military judge to reserve his request until the Government completed its case-in-chief.

During the Government's case-in-chief, Mr. Flohr identified a bottle, seized from appellant's locker (Prosecution Exhibit 7), and testified that it contained a mixture of Pyrodex gunpowder, the "first fire" mixture from an M127A1 illuminator, and "flattened ball, double based smokeless [gun]powder," consistent with the powder from M–16 rifle cartridges. On cross-examination, Mr. Flohr testified that the Pyrodex mixture was "safe to send through the mail."

Mr. Flohr also identified a device seized from appellant's locker (Prosecution Exhibit 5) which was disassembled in the laboratory. The device included a flashbulb with the glass removed, red and black wires, and a tube that appeared to be a toilet paper cardboard tube wrapped in multiple layers of silver duct tape, with a metal liner made from an iced tea can. Mr. Flohr testified that the tube contained a condom filled with a substance containing urea and ammonium sulfate, and approximately 18.7 grams of Pyrodex gunpowder. The tube also contained a plug at one end made from "Play–Doh," and plugs made from snuff cans and hot glue.

On cross-examination, Mr. Flohr testified that the flashlight bulb's tungsten filament was missing and he was unable to find it. He testified that ammonium sulfate will smoke but will not "sustain combustion."

On examination by the military judge, Mr. Flohr testified that he conducted an experiment with a small quantity of the Pyrodex gunpowder taken from the device, igniting it by removing the glass from a flashlight bulb similar to the one found in appellant's locker, and illuminating the filament to ignite the powder. In the experiment, the powder ignited and produced a bright flash. Mr.

Flohr testified that if the 18.7 grams of powder from appellant's device were ignited, he "would expect a very brilliant flash." If it were ignited in the tube, "it would produce a loud report and then throw the disks and the hot glue, and it would eject those."

Mr. May testified that he began working for ATF on September 8, 1995, upon his retirement from the Army, where he served as an explosive ordnance disposal technician for 15 years. After cross-examining Mr. May extensively about his training and experience, defense counsel accepted him as an expert witness.

Mr. May testified that if the device seized from appellant were ignited, it "would explode causing the container to violently burst, projecting metal fragments." He testified that, "although this device is not like a grenade, it would have the similar effects that a grenade would have. It would produce fragments that are basically anti-personnel in nature." He testified that the device has "no social or industrial applications" and that it, "as constructed, could be used as a weapon." He based his opinion on the fact that the tube contained "a metal sleeve" that "would produce fragmentation." Asked why fertilizer would be placed in a device, Mr. May testified that ammonium nitrate is "an explosive mixture," but ammonium sulfate, the substance seized from appellant, is not "an explosive mixture."

Mr. May was asked if he would classify the device as "just a big firecracker." He responded that he would not, because of the metal sleeve.

On cross-examination, Mr. May stated that it was the metal sleeve that made the device a "destructive device" instead of an illegal explosive device. He agreed that the metal from the iced tea can, which was only one-tenth of a millimeter thick, was "light shrapnel."

Defense counsel followed with an extensive cross-examination based on the question, "what have you worked with containing metal that would have less of an explosive and destructive effect that this thing right here," referring to appellant's device. Eventually,

Mr. May testified that appellant's device was somewhere in the middle of explosive and destructive power, between a pipe bomb and an M–80 firecracker. He qualified his answer, saying, "I can truly say I have not worked with a device that was made out of a soda can with powder in it."

Defense counsel continued to explore the question of the destructive power of appellant's device in the following cross-examination:

Q. So, everything else that you worked with, with metal, would you say had thicker metal or more metal?

A. I'm thinking ... I'm trying to give you a truthful answer here. Most of the devices that I look at have thicker metal. Yes.

Q. And do most of the devices you look at have more powder when they contain metal?

A. Well, you're trying to compare improvised explosive devices. But again there's no mil specs on them. It's left up to the imagination of the builder. Have I worked with devices with more powder? Yes. Have I worked with devices with less powder? Yes.

DC. Your Honor, is there any other way I could ask the question?

MJ. I think he's answered the question.

DC. Okay. I think we're there.

* * *

Q. And by saying that, you're saying the metal can distinguishes it from mere firecracker status?

A. Well, the quantity of powder distinguishes [it] from a legal firecracker to an illegal device. The container, the metal container, distinguishes it from an illegal device, a destructive device, an anti-personnel weapon.

Q. Now, is it possible that if this device were detonated, that one or both of the lids would pop off?

A. With no shrapnel?

Q. With no shrapnel effect.

A. I'll have to answer that question separately. Yes, it's possible. But, yes, there will be shrapnel effects because you've got that thin, metal snuff can that's going to come flying out. You're going to have shrapnel. Well, actually, sir, you're going to have frag. The definition of shrapnel is something—as a metal container will fragment. But if I take BBs or nails taped to the outside of this, I'm adding shrapnel.

Q. So, the fragments that you would have, under the best case scenario, being the least damaging, is frags, which would consist of the metal disks on the ends, one or both, flying off with no other effect?

A. I would not say best case scenario. I would say it is probable, or possible, that this device functioning, yes, it could blow out, yes, a metal disk will fly. It's also probable, more probable, that the container, the whole container itself, would rupture.

Q. Why is that?

A. The hot glue will cause a seal and once the powder starts burning it's gonna go to an explosion and that container is going to come apart. The whole container itself is going to fly, creating a fragmentation effect in itself.

Q. But the fact that it's taped up on the sides wouldn't help to prevent shrapnel?

A. Oh, no, sir.

* * *

Q. Would a type of seal on the device have anything to do with that, how well it was sealed?

A. For having to do with what, sir?

Q. Would that affect the explosion?

A. If you had—the better the seal, the greater the pressure increase; the greater the pressure increase, the better the explosion.

Q. So, if it were old or mishandled, it's possible that we would have a lesser seal and, therefore, a lesser explosion?

A. If you've got a leak in your seal, you could have—you still would have an explosion. So, as I said, you can take powder and I can pile the Pyrodex up on that typewriter table without any other confinement other than the pile itself and I can

get that to explode. You're still going to have an explosion.

Q. But you really can't tell exactly how much of an explosion—

A. Oh, no, sir—

Q. —based upon what we got—

A. No, sir. I can tell you the probable effects based on my experience. But I can't tell you as an exact science. No, sir.

At the conclusion of the Government's case, defense counsel renewed his request for expert assistance. Defense counsel asserted that Mr. May was unable to adequately assist the defense because he works for ATF, had worked for ATF for only a short time, is still a probationary employee, and was uncooperative on cross-examination, i.e., "he just wouldn't grasp it [the last series of questions] and acknowledge the issues" that defense counsel wanted to raise. The following dialogue then ensued:

DC: ... What the defense requests is a witness who would work with the defense to help us decide whether or not any expert could tell, based upon the set of facts as exemplified by Prosecution Exhibit 5 [the materials seized from appellant's locker], whether or not any expert could make an opinion as to the volatility of the device.

MJ: Volatility being what?

DC: What would happen if it exploded. He first said it would definitely throw shrapnel and then he called them "frags" and then he said it's possible that it might not throw frags. What I want to do is find and talk to a defense expert who would say, based upon Prosecution Exhibit 5 as it sits here, no member of the ATF, particularly a post-blast analyst, can look at this device and tell what it could have done if it were assembled properly—depending on the age of the thing, how it's been handled, volatility, leaking, things like that.

MJ: I don't think that you've made an adequate showing that you need an expert. There doesn't seem to be any real dispute that the materials that were included in there were explosive materials and, if ignited, that they could propel whatever materials were in there, metal materials or what have you. That is what Mr. May testified to. I don't believe you've made an adequate showing that any consultation with another expert would be beneficial to you on the points for which you offered it.

Your request is denied.

### Discussion

■■■■ RCM 703(d) authorizes employment of experts to assist the defense at government expense when their testimony would be "relevant and necessary," if the Government cannot or will not "provide an adequate substitute." This Court has observed that "upon a proper showing of necessity, an accused is entitled to" expert assistance. *United States v. Burnette,* 29 MJ 473, 475, *cert. denied,* 498 U.S. 821, 111 S.Ct. 70, 112 L.Ed.2d 43 (1990). This Court has adopted a three-pronged test for determining whether expert assistance is necessary:

First, why the expert assistance is needed. Second, what would the expert assistance accomplish for the accused. Third, why is the defense counsel unable to gather and present the evidence that the expert assistant would be able to develop.

*United States v. Gonzalez,* 39 MJ 459, 461, *cert. denied,* 513 U.S. 965, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994).

■■■ We review the military judge's decision on a request for expert assistance for abuse of discretion. *See United States v. Washington,* 46 MJ 477, 480 (1997), citing *United States v. Garries,* 22 MJ 288, 291 (CMA), *cert. denied,* 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1986), *cert. denied* in *Washington,* 522 U.S. 1051, 118 S.Ct. 698, 139 L.Ed.2d 642 (1998).

■■■ Applying the above *Gonzalez* test, we hold that the military judge did not abuse his discretion. The Government made a forensic chemist and an explosives expert available, and the record reflects that both were interviewed by the defense before the Government presented its case on the merits. Although the defense complained that Mr. May was a probationary employee of ATF with less than one year's experience, Mr. May also had 15 years of experience as an Army explosive ordnance disposal technician,

and defense counsel conceded at trial that he was an expert.

Defense counsel's complaint about Mr. May's answers on cross-examination arose from Mr. May's unwillingness to agree that the device in question was "just a big firecracker." Mr. May adamantly insisted that, even if the metal liner did not rupture, the metal end caps would still produce a fragmentation effect. Defense counsel asked for an expert to "help us decide whether or not any expert" could express an opinion contrary to Mr. May's.

Appellant's request satisfies the first *Gonzalez* prong. He needed an expert to testify that the device was "just a big firecracker" and not a "destructive device." More specifically, the defense wanted an expert to contradict Mr. May's testimony that the device would produce a fragmentation effect if detonated.

Whether appellant's request satisfies the second *Gonzalez* prong is a closer question. He wanted an expert to help him find an expert. In essence, he was asking the Government to find him an expert who could tell him whether the Government's expert could be contradicted. We need not decide, however, whether the second prong is satisfied, because appellant's request fails the third

*Gonzalez* prong. The record does not show any efforts on the part of the defense to determine if an expert existed who could contradict Mr. May. There is nothing in the record indicating whether defense counsel had done any independent research or had any specific basis for questioning the responses given by the government expert. *See generally United States v. Short*, 50 MJ 370, 373 (1999) (defense counsel expected to do "homework").

### Decision

The decision of the United States Army Court of Criminal Appeals is affirmed.

SULLIVAN, Judge (concurring):

I write only to say that I still believe *United States v. Short*, 50 MJ 370 (1999), was wrongly decided. There, the Government at trial conceded that an expert was necessary and proffered a "conflicted" one. *Id.* at 378–79 (Effron and Sullivan, JJ., dissenting). No such concession exists in this case, and I agree with the majority that appellant did not establish the third prong of necessity under *United States v. Gonzalez*, 39 MJ 459, 461 (CMA), *cert. denied*, 513 U.S. 965, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994).