UNITED STATES of America

v.

Wade L. WALKER, Lance Corporal
(E–3), U.S. Marine Corps.

NMCCA 9501607.

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged: 19 Feb. 2010.

31 Jan. 2012.

For Appellant: LT Daniel W. Napier, JAGC, USN; LT Daniel LaPenta, JAGC, USN.

For Appellee: Capt. Samuel Moore, USMC.

Before J.K. CARBERRY, B.L. PAYTON–O'BRIEN, R.Q. WARD, Appellate Military Judges.

## PUBLISHED OPINION OF THE COURT

CARBERRY, Senior Judge:

The appellant was tried in 1993 at a general court-martial composed of officer members. Contrary to his pleas, he was convicted of two specifications of conspiracy, two specifications of violating a general order, two specifications of premeditated murder, and one specification each of armed robbery, adultery, and kidnapping, violations, respectively, of Articles 81, 92, 118, 122, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 892, 918, 922, and 934. The members sentenced the appellant to death, forfeiture of all pay and allowances, and reduction to pay grade E–1. The convening authority (CA) approved the sentence as adjudged.[1]

In 2008, this court issued an opinion, *United States v. Walker*, 66 M.J. 721 (N.M.Ct. Crim.App.2008), in which we affirmed one of the findings of guilty to violating Article 118, UCMJ, except for the language "with premeditation," set aside the finding of guilty to the armed robbery specification, and affirmed the findings of guilty for the remaining charges and specifications. We set aside the sentence and authorized the CA to hold a rehearing on the armed robbery and the excepted language as it pertained to the one murder specification, and on sentencing. *Id.* at 757. At the conclusion of the findings rehearing, a general court-martial composed of officer and enlisted members found the appellant guilty of armed robbery and premeditated murder. The appellant was sentenced for all of his offenses to confinement for life, a dishonorable discharge, reduction to pay grade E–1, and a reprimand. The CA approved the sentence as adjudged and ordered it executed "[i]n accordance with the UCMJ, Rules of [sic] Courts–Martial, applicable regulations, the pretrial agreement and this action . . . ."[2]

The appellant raises nine assignments of error on appeal. After carefully considering the record of trial and the parties' briefs, we conclude that this court erred in our 2008 opinion to the extent that we authorized a partial rehearing on the sole element of premeditation for the one Article 118, UCMJ, specification. That portion of the proceeding violated the appellant's constitutional protection against Double Jeopardy. Accordingly, we set aside the finding of guilty from the rehearing as to Specification 1 under Charge III, and reaffirm our earlier finding of guilty of the lesser included offense of unpremeditated murder. We find that the remaining findings, including the finding of guilty at the rehearing of armed robbery and the findings affirmed in our 2008 opinion, as well as the approved sentence, are correct in law and fact and that no error materially prejudicial to the appellant's substantial rights remains. Arts. 59(a) and 66(c), UCMJ.

## FACTS

### *The Murder of Lance Corporal Rodney L. Page, USMC*

During the evening of 26 March 1992, the appellant gathered with Lance Corporal (LCpl) Kenneth G. Parker, USMC, and four other Marines (LCpl Terence D. McDonald, LCpl Michael L. Curry, LCpl Joseph L. Adams, and LCpl Frederick Brown) in a barracks room onboard Marine Corps Base, Camp Lejeune near Jacksonville, North Car-

---

1. We note that the record of trial from the 1993 court-martial is missing Defense Exhibit ZZ, which is described in the record at page 2023 as a black binder containing "other mitigation evidence." The sentence from the original trial having been set aside, the absence of the exhibit does not constitute a major omission which would preclude our review of the case.

2. We note that there was no pretrial agreement in this case. This portion of the CA's action is erroneous, but harmless to the appellant. To the extent that the CA's action purported to execute the dishonorable discharge, it was a nullity. *United States v. Bailey,* 68 M.J. 409 (C.A.A.F. 2009).

olina. The six Marines were drinking alcohol and exchanging rumors about a group of white Marines who allegedly tried to lynch a black man. They became angry and agreed on a plan to exact revenge by killing a white man. At around 2200, the six Marines left the barracks and got into two cars. The appellant brought his shotgun with him, and in the other car, LCpl Brown brought his shotgun. As they drove away, the appellant said, "one of those mother* * * *ers is going down tonight." Record at 843.

While they were driving, the appellant showed LCpl Adams how to load the shotgun. They soon saw a lone white man, LCpl Rodney L. Page, USMC, walking along the side of the road. The appellant pointed and said, "that's the guy we gonna get right there." *Id.* at 854. None of the Marines in the two cars knew LCpl Page. The appellant told LCpl McDonald that they should take the victim's wallet to make the crime appear to be a random robbery. As LCpl Page walked past a roadside bar, they pulled their cars off the highway and parked behind the bar. LCpl Adams and LCpl Parker got out of their vehicles carrying loaded shotguns. They accosted LCpl Page and demanded his wallet. LCpl Page begged for his life. They assured him he would not be hurt and began walking away. LCpl Parker then turned around and killed LCpl Page with a single shotgun blast to the midsection.

The two men ran back to their cars. When the appellant learned that LCpl Page was shot by LCpl Parker and not LCpl Adams, the appellant berated LCpl Adams: "[W]hy didn't you do anything? ... [Y]ou could have shot him. You could have hit him. You could have butt stroked him. You could have done something." *Id.* at 857. The appellant took LCpl Page's wallet and promised to burn it. The group then drove to a nearby residential area and parked. LCpl Adams recounted the story for the group. They then agreed on an alibi for their whereabouts and dispersed.

*The Murder of Lance Corporal Christopher Q. James, USMC*

In January 1992, approximately two months before the murder of LCpl Page, the appellant moved into the on-base quarters of a fellow platoon member, LCpl Christopher Q. James, USMC. LCpl James lived with his wife, Vicky James, but their marriage was strained. The couple fought regularly and LCpl James occasionally became violent. Soon after the appellant moved in, he began an extramarital affair with Mrs. James and voiced his disapproval of the way LCpl James treated Mrs. James. On two occasions, the appellant announced his intentions to kill LCpl James. He also reported the spousal abuse to their command, which led to the appellant moving out of the James' household. He nonetheless continued his relationship with Mrs. James.

On 30 March 1992, four days after the murder of LCpl Page, the appellant and another man visited Mrs. James. LCpl James was not home at the time. Mrs. James did not know the man with the appellant, but she recalled hearing the name "Parker." The appellant told Mrs. James that LCpl James was going to "get done." *Id.* at 1042. Mrs. James took this to mean that the appellant intended to harm her husband. Mrs. James told the appellant that she did not want anyone to get hurt. The appellant replied that he would "do [LCpl James]." *Id.* The appellant then left the home and called Mrs. James a few minutes later from a nearby payphone to say that he had just seen LCpl James drive by. The appellant told Mrs. James that she was not "dealing with an amateur," and that he had "done it before." *Id.* at 1045. Mrs. James asked when and he replied "Thursday."[3] *Id.*

LCpl James came home shortly after the appellant's phone call. The appellant then returned to the home, still accompanied by the man called "Parker." Mrs. James was in a different room, but she heard the three men—her husband, the appellant, and "Parker"—laughing. LCpl James walked into the room where Mrs. James was, kissed her, and said he was going to a party with the appellant and "Parker." The three men then left the James' home.

Shortly afterwards, a shotgun blast was heard from a nearby road. The appellant's

**3.** 26 March 1992, the night LCpl Page was shot, was a Thursday.

car was then seen racing away from where the sound originated. Later that night, the appellant called Mrs. James and told her that it was "done" and she had her "divorce." He told her that his "buddy" shot LCpl James in the stomach and LCpl James "jerked forward." *Id.* at 1048–49. The appellant drove to a friend's house, borrowed a rag, and scrubbed the rear fender of his car. The appellant said to his friend, "if anybody asks, we've been with you all day." *Id.* at 1233.

The appellant and LCpl Parker were apprehended the next day, 31 March 1992.

## PROCEDURAL HISTORY

The appellant was tried in 1993 at a general court-martial composed of officer members. The appellant was convicted of two specifications under Article 81, UCMJ: one specification for conspiring to commit armed robbery, assault with a loaded firearm, and the premeditated murder of LCpl Page; another specification for conspiring to commit kidnapping and the premeditated murder of LCpl James. The appellant was also convicted of two specifications under Article 92 for violating a general order by possessing an unregistered firearm; two specifications under Article 118: one specification for the premeditated murder of LCpl Page and the other specification for the premeditated murder of LCpl James; one specification under Article 122 for the armed robbery of LCpl Page; one specification under Article 134 for adultery with Mrs. James; and a final specification under Article 134 for kidnapping LCpl James.

The members sentenced the appellant to death, forfeiture of all pay and allowances, and reduction to pay grade E–1. In June 1995, the CA approved the sentence as adjudged. In August 1995, the record of trial was docketed with this court. In August 1996, this Court remanded the case for new post-trial processing with a different CA. Two years later, the new CA approved the adjudged sentence and the case was re-docketed with this Court. For the next ten years, until 2008, considerable appellate activity took place, much of it concerning the capital nature of the case.

In July 2008, this court issued an opinion addressing a number of assignments of error raised by the appellant. We held: (1) the evidence presented by the Government was factually and legally sufficient, and left no reasonable doubt as to the appellant's guilt for all offenses; (2) the military judge erred by denying the appellant's request for a continuance so his expert would have enough time to explore the possibility that the appellant's voluntary intoxication negated the requisite *mens rea* for the specific-intent crimes of robbery and premeditated murder of LCpl Page; (3) the military judge erred during the reopened findings phase by unduly limiting the appellant's opportunity to present evidence and by improperly playing a tape-recorded portion of an Article 39(a) session; (4) the military judge abused his discretion by denying the appellant's experts an opportunity to conduct independent forensic testing, but in light of the sum of evidence presented, the strength of the Government's case-in-chief was overwhelming and the military judge's error was harmless beyond a reasonable doubt; (5) the military judge did not commit plain and obvious error by failing to provide the members with a spillover instruction; (6) the military judge erred by liberally and excessively using R.C.M. 802 conferences to resolve adversarial matters outside the presence of the appellant, but these errors were harmless beyond a reasonable doubt; (7) the post-trial delay did not warrant any additional relief for the appellant; and, (8) there was a cumulative effect from the errors below that warranted the appellant additional relief.

We affirmed the lower court's findings of guilty for the two Article 81 specifications (conspiracy), the two specifications under Article 92 (general order violations), one of the specifications under Article 118 (premeditated murder of LCpl James), and the two specifications under Article 134 (adultery with Mrs. James and kidnapping of LCpl James).

With respect to the appellant's conviction for the premeditated murder of LCpl Page, we affirmed the findings of guilty except for the language "with premeditation." We also set aside the conviction for the armed rob-

bery of LCpl Page and the sentence. We authorized a rehearing on the robbery offense and the premeditation element of the LCpl Page murder. We also authorized new sentencing proceedings. In 2009 and 2010, the CA held a rehearing in accordance with our decision. The appellant was again convicted of the armed robbery and premeditated murder of LCpl Page and was sentenced to confinement for life, a dishonorable discharge, reduction to pay grade E–1, and a reprimand for all the crimes of which he was convicted.

At the rehearing, before deliberations on findings, the military judge gave the following instructions to the members:

> In Specification 1 of Charge III, the accused is charged with the offense of premeditated murder in violation of Article 118, UCMJ. For this specification only, and no other, you are instructed that as a matter of law, the following elements of premeditated murder have been proven beyond a reasonable doubt at the first trial of the accused and are not in dispute here.

Record at 4101.

The military judge proceeded to list the first three statutory elements of premeditated murder under Article 118, UCMJ: that LCpl Page was dead, that LCpl Page's death was caused by LCpl Parker's act, and that the killing of LCpl Page was unlawful. *Id.* at 4101–02. The military judge then instructed:

> Accordingly, since these elements have already been established beyond a reasonable doubt, as a matter of law, the sole determination for you regarding this specification is that in order to find the accused guilty, you must be convinced by legal and competent evidence beyond a reasonable doubt as to the sole remaining element, which is: [f]ourth, that at the time of the killing, the accused had a premeditated design to kill Lance Corporal Rodney L. Page.

*Id.* at 4102.

## DISCUSSION

The appellant now submits nine assignments of error (AOEs) to this court. The appellant argues:

*AOE I:* That we erred in our 2008 *Walker* opinion by authorizing a rehearing as to the excepted language ("with premeditation") from Charge III, Specification 1. The appellant claims that this rehearing violated his constitutional protection against Double Jeopardy by subjecting him to a second trial for a previously tried offense, and it violated his Due Process rights by permitting the Government to try a case in which it was relieved of its obligation to prove each and every element of the offense of premeditated murder.

*AOE II:* That we erred in our 2008 *Walker* opinion by failing to set aside all of the appellant's specific-intent offenses. We held that his voluntary intoxication on 26 March 1992, may have negated the specific-intent *mens rea* required by premeditated murder and robbery, but we ignored his other specific-intent crimes from that night, including conspiracy and unpremeditated murder.

*AOE III:* That the military judge at the rehearing erred by denying the appellant's request for expert assistance and a positron emission tomography (PET) scan.

*AOE IV:* That the military judge in the first trial erred by denying the appellant an opportunity to present a complete defense with respect to the murder of LCpl James.

*AOE V:* That we erred in our 2008 *Walker* opinion by holding harmless the military judge's erroneous decision to deny the defense access to the Government's forensic evidence.

*AOE VI:* That we erred in our 2008 *Walker* opinion by applying plain-error analysis to the military judge's failure to give a spillover instruction to the members.

*AOE VII:* That he is entitled to meaningful relief for the extensive period of time he has spent in confinement awaiting appellate review.

*AOE VIII:* That the Court of Appeals for the Armed Forces erred by holding in *United States v. Morgan*, 37 M.J. 407 (C.M.A. 1993), that voluntary intoxication will not negate the specific-intent *mens rea* required for the crime of unpremeditated murder.

*AOE IX:* That Specifications 1 and 2 of Charge V, both of which allege violations of Article 134 (adultery and kidnapping, respectively), fail to state offenses because they omit the terminal element.

### AOE I—Double Jeopardy

█ In our 2008 *Walker* opinion, we held that the military judge abused his discretion by denying the defense's request for a continuance. *Walker,* 66 M.J. at 739. The defense had sought a continuance to allow its expert witness to adequately prepare evidence on the impact of the appellant's alcohol consumption. The defense intended to demonstrate that the appellant's voluntary intoxication negated his ability to form the necessary *mens rea.* We determined that as a consequence of the military judge's erroneous decision, the appellant suffered material prejudice. *Id.*

As redress, we affirmed the finding of guilty of Charge III, Specification 1, except for the language "with premeditation," thus affirming a finding of guilty of the lesser included offense of the unpremeditated murder of LCpl Page. We also set aside Charge IV, the armed robbery of LCpl Page, and the sentence. *Id.* at 757. We noted that voluntary intoxication may reduce premeditated murder (Article 118(1)) to the lesser included offense of unpremeditated murder (Article 118(2) or 118(3)). *Id.* at 740. *See also* MANUAL FOR COURTS–MARTIAL, UNITED STATES (1984 ed.), Part IV, ¶ 43(c)(2)(c). We concluded that "the lesser included offense of unpremeditated murder remain[ed] viable." *Walker,* 66 M.J. at 740. Lastly, we authorized the CA to hold a rehearing on the language "with premeditation," as well as the offense of armed robbery and the sentence. *Id.* at 757. In other words, to remedy the material prejudice caused by the military judge's erroneous denial of the defense's continuance request, we affirmed the appellant's conviction of a lesser included offense for the underlying act, carved out a single element of the crime of premeditated murder, and permitted the Government to proceed on just that element in a second trial.

The appellant now takes issue with our remedy as to the premeditated murder charge. He makes two arguments against it.

The first is that the rehearing subjected him to Double Jeopardy. The second is that the limited scope and nature of the rehearing offended his Due Process rights, as the Government was relieved of its burden of proving every element of premeditated murder. These arguments are closely related: neither the Double Jeopardy clause nor the Due Process clause would have been violated if we had authorized a rehearing on all the elements of premeditated murder, but they are also distinct and require separate constitutional analyses. We begin by considering the Double Jeopardy argument.

The Fifth Amendment states, "[no person] shall be subject for the same offense to be twice put in jeopardy of life or limb." This is, of course, the Double Jeopardy clause, and it expresses the principle that the vast resources and authority of the Government should not be used to subject a person to repeated prosecutions for a single underlying criminal transaction. The Supreme Court has invoked this principle in a number of ways, one of which is to protect a person from prosecution for an offense he was already convicted of committing. "[W]here . . . a person has been tried and convicted for a crime which has various incidents included in it, he cannot be a second time tried for one of those incidents without being twice put in jeopardy for the same offence." *In re Nielsen,* 131 U.S. 176, 188, 9 S.Ct. 672, 33 L.Ed. 118 (1889). Indeed, " 'central to the objective of the prohibition against successive trials' is the barrier to 'affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.' " *United States v. DiFrancesco,* 449 U.S. 117, 128, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980) (quoting *Burks v. United States,* 437 U.S. 1, 11, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)). Otherwise, "if the Government may reprosecute, it gains an advantage from what it learns at the first trial about the strengths of the defense case and the weaknesses of its own." *Id.* Another important consideration is the appellant's "valued right to have his trial completed by a particular tribunal." *Arizona v. Washington,* 434 U.S. 497, 503, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978) (quoting

*Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949)).

An exception has developed, however, to the notion that an accused's conviction may not be followed by a subsequent prosecution for the same offense; that is, when an appellate court has intervened to set the first conviction aside. "The principle ... [that the Government is not precluded from] retrying a defendant whose conviction is set aside because of an error in the proceedings leading to conviction is a well-established part of our constitutional jurisprudence." *United States v. Tateo,* 377 U.S. 463, 465, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964). There is a policy justifying this exception—"[i]t would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction." *Id.* at 466, 84 S.Ct. 1587. The Government simply does not guarantee a defendant that a conviction will, in all circumstances, be the product of a single, error-free trial. *United States v. Jorn,* 400 U.S. 470, 484, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971).

In this line of jurisprudence, where the accused prevailed on appeal after trial and conviction, the Government was authorized a retrial, but the retrials were fuller proceedings than the one we have here. *See, e.g., DiFrancesco,* 449 U.S. at 117, 101 S.Ct. 426; *Burks,* 437 U.S. at 1, 98 S.Ct. 2141; *Jorn,* 400 U.S. at 470, 91 S.Ct. 547; *United States v. Ewell,* 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); *Tateo,* 377 U.S. at 463, 84 S.Ct. 1587; *Forman v. United States,* 361 U.S. 416, 80 S.Ct. 481, 4 L.Ed.2d 412 (1960) (overruled on other grounds); *Stroud v. United States,* 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919); and *United States v. Ball,* 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896). In each of these retrials, the Government presented evidence on every element of the recharged offense. In none of them, nor in any precedent we could find, was the Government permitted a retrial in which it could explain to the fact finder that all elements, save one, were to be considered resolved as a matter of law.

But that is exactly what happened in this case. The CA followed the mandate we established in our 2008 opinion and held a limited rehearing on the element of premeditation. We are left, then, with a subsidiary question: does the policy that permits a retrial after an accused's conviction has been set aside allow the Government the enormous advantage of concerning itself with only one discrete element at that retrial? In the absence of any precedent supporting such a policy extension, we conclude that it does not.[4] The rehearing did not, therefore, fall within the exception to the Constitution's general prohibition against retrial after conviction. We hold that the rehearing as to the charge of the premeditated murder of LCpl Page violated the appellant's Fifth Amendment right to be protected from Double Jeopardy.

Because we find in the appellant's favor with respect to his Double Jeopardy argument, there is no need to address his Due Process argument.

### AOE III—Expert Assistance

In AOE III, the appellant argues that the military judge at the rehearing erred by denying the defense's request for expert assistance in the form of a PET scan. The defense sought a PET scan to corroborate a theory of certain neurological deficiencies. The defense also sought expert assistance from Dr. Wu in conducting the scan and interpreting the results. The appellant argues that the PET scan and Dr. Wu's expertise were necessary and relevant to confirm the findings of Dr. Golden, a board-certified clinical neuropsychologist, who had concluded that the appellant suffered from frontal-lobe deficits that impaired his executive decision-making.

█ An appellant is entitled to expert assistance provided by the Government if he can demonstrate necessity. *United States v. Garries,* 22 M.J. 288, 291 (C.M.A.1986). To demonstrate necessity, an accused "must

---

4. We do not reach this conclusion simply because we are unable to ground our earlier decision in established precedent. We are also convinced that the limited nature of the rehearing offends our notions of fundamental fairness.

demonstrate something more than a mere possibility of assistance from a requested expert ... [the] accused must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." *United States v. Robinson*, 39 M.J. 88, 89 (C.M.A.1994) (quoting *Moore v. Kemp*, 809 F.2d 702, 712 (11th Cir.), *cert. denied*, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987)). The Court of Appeals for the Armed Forces (CAAF) has adopted a three-part test for determining necessity: "First, why the expert assistance is needed. Second, what would the expert assistance accomplish for the accused. Third, why is the defense counsel unable to gather and present the evidence that the expert assistant would be able to develop." *United States v. Gonzalez*, 39 M.J. 459, 461 (1994). We test a military judge's decision on a request for expert assistance for abuse of discretion. *United States v. Ford*, 51 M.J. 445, 455 (C.A.A.F.1999).

█ The defense argued in its motion to the military judge that Dr. Wu and a PET scan were necessary "to confirm, with physical, scientific evidence, the results found by Dr. Golden by his battery of psychological tests." Appellate Exhibit CDXXVI at 5. Dr. Golden had conducted eleven psychological examinations of the appellant and determined that he suffered from frontal lobe deficits that negatively affected, among other things, his judgment, flexibility, planning, organizational skills, and his ability to control his emotions and solve complex problems. Dr. Golden claimed to be "certain" of this diagnosis, but recommended a PET scan for confirmation "beyond a reasonable doubt." *Id.* at 45. The defense further argued that the PET scan was necessary because it would give the members "another way to look at the functioning, the executive functioning of Lance Corporal Walker, which is objective," and that the test was needed "because it's going to provide additional data that helps us present a mitigation case to the members." Record at 2780, 2785.

In response to the defense's request, the Government presented testimony from Dr.

Mayberg, a neurologist, who wholly discounted the defense theory and claimed that a PET scan would offer no additional support to Dr. Golden's conclusions. Based on the testimony from Dr. Mayberg, Dr. Wu, and Dr. Golden, the military judge denied the defense's request for a PET scan and Dr. Wu's expert assistance. The military judge ruled:

I don't believe based upon the testimony that was provided by Doctor Golden that Doctor Wu's testimony is either relevant or necessary. I don't believe that it will add anything material for the defense even in mitigation in this case. Doctor Golden will be able to testify that to a reasonable degree of medical certainty, Lance Corporal Walker suffers from frontal lobe deficits. That's the diagnosis. It does not have to be confirmed to a 100 degree [sic] certainty as he indicates he would like it to be.... So I'm not ordering that he be produced by the government.

*Id.* at 2795.

Considering the defense's argument for the need of a PET scan and Dr. Wu's expert assistance, we conclude that the military judge did not abuse his discretion by determining that the PET scan and Dr. Wu's assistance were unnecessary or cumulative. The Government had already provided the defense with assistance from Dr. Golden who reported that he was "certain" of his conclusion. Additional testing and expert assistance would have been at most corroborative. We are also unable to conclude that additional assistance would have accomplished anything of value for the defense. The Government's expert, Dr. Mayberg, said that under the circumstances, the proposed use of a PET scan to confirm neuropsychological testing of frontal lobe deficits was "totally invalid and untested." *Id.* at 2765. Given the limited utility of the PET scan as it related to Dr. Golden's testimony, the military judge's decision did not amount to an abuse of discretion.

Lastly, the appellant argues that the military judge's error was compounded by the trial counsel's attack on the reliability of Dr. Golden's testimony. The appellant's argument is based on two comments from the trial counsel's closing argument: that Dr.

Golden worked for the defense team and that his comments about what took place in 1992 were "speculative at best." Neither of these comments, however, was predicated on the absence of a PET scan. The former was the Government's attempt to imply bias on Dr. Golden's part. The latter was a logical inference. Dr. Golden said only that he was "reasonably certain" that a contemporarily performed PET scan would have produced a sound conclusion about the appellant's neurological condition in 1992. It was therefore permissible for the Government to argue that Dr. Golden's diagnosis was speculative; even if a PET scan had been contemporarily performed, any conclusion about its relationship to the appellant's capacity to form specific-intent at the time of the offenses would have been less than certain. In other words, a PET scan would not have necessarily prevented trial counsel's allegedly improper argument. Under these circumstances, we conclude that trial counsel's argument did not unfairly exploit the military judge's denial of the defense's request.

### AOE IX—Adultery, Kidnapping, and the Terminal Element of Article 134

In AOE IX, the appellant argues that the Article 134 specifications alleging adultery and kidnapping failed to state offenses because they omitted Article 134's terminal element. The adultery specification, Charge V, Specification 1, stated in relevant part:

> In that Lance Corporal Wade L. Walker, U.S. Marine Corps ... on active duty, a married man, did ... wrongfully have sexual intercourse with Mrs. Victoria James, a married woman not his wife.

The kidnapping specification, Charge V, Specification 2, stated in relevant part:

> In that Lance Corporal Wade L. Walker, U.S. Marine Corps ... did ... willfully and wrongfully inveigle, decoy, seize, and hold Lance Corporal Christopher Q. James, U.S. Marine Corps, against his will.

We review *de novo* whether a specification states an offense. *United States v. Crafter*, 64 M.J. 209, 211 (C.A.A.F.2006). A specification must allege every element of the offense "either expressly or by necessary implication, so as to give the accused notice and protect him against double jeopardy," if

it is to state an offense. *United States v. Dear*, 40 M.J. 196, 197 (C.M.A.1994) (citations and internal quotation marks omitted). Article 134 specifications must therefore include the terminal element either explicitly or by implication. *United States v. Fosler*, 70 M.J. 225, 229 (C.A.A.F.2011).

In *Fosler*, the CAAF held that merely including the word "wrongfully" in the specification and listing it as an Article 134 offense was insufficient to necessarily imply that the accused's conduct was prejudicial to good order and discipline, or was of a nature to be service-discrediting. The CAAF's holding, however, was limited to specific circumstances: "[i]n contested cases, when the charge and specification are first challenged at trial, we read the wording more narrowly and will only adopt interpretations that hew closely to the plain text." *Id.* at 230 (citation and footnote omitted). But *Fosler* also cites by comparison an earlier case concerning insufficient specifications, *United States v. Watkins*, 21 M.J. 208, 209–10 (C.M.A.1986), which posited a more tolerant view of deficient specifications if they were challenged for the first time on appeal and were not otherwise so defective that they could not "within reason be construed to charge a crime." *Id.* at 210 (internal quotation marks omitted). In light of the twin analyses of *Fosler* and *Watkins*, this court has since held that:

> [W]e view allegations of defective specifications through different analytical lenses based on the circumstances of each case. Where the specification was not challenged at trial, we liberally review the specification to determine if a reasonable construction exists that alleges all elements either explicitly or by necessary implication. Where the specification was challenged at trial, however, we review it by constructing its wording narrowly, adhering closely to the plain text.

*United States v. Hackler*, 70 M.J. 624, 626 (N.M.Ct.Crim.App.2011).

Applying this framework to this case, we begin by noting that although this was a contested court-martial, the appellant did not challenge either specification for its omission

of the terminal element until his most recent appeal. We therefore read the specifications with maximum liberality and uphold them as valid unless they are so defective that they cannot reasonably be construed to charge crimes.

The adultery specification alleged that the appellant wrongfully had intercourse with a married woman. The kidnapping specification alleged the kidnapping of a fellow Marine. Read liberally, these specifications allege that the appellant's actions were of a nature to be service discrediting, or were prejudicial to good order and discipline within the unit, or both. Neither specification is so defective that it cannot be reasonably construed to charge a crime. We conclude that the wording of these specifications necessarily imply the terminal element of Article 134; the Government's charges put the appellant on sufficient notice of what he needed to defend against. We hold that Charge V, Specifications 1 and 2, state offenses.

### Remaining AOEs

The appellant assigns six additional AOEs (II, IV, V, VI, VII, and VIII). Several of these arguments arise from alleged errors made by the military judge at the first trial. We have previously considered and addressed each of the remaining six errors in our 2008 *Walker* opinion. The appellant now reasserts these arguments and claims that our consideration of each was flawed. In response to the appellant's renewed arguments, we have reviewed the record of trial and the parties' briefs. After careful consideration, we continue to adhere to our previous rationale and reaffirm our conclusions with respect to each of these six assignments of error. In so doing, we rely on the law of the case doctrine.

Law of the case doctrine provides that when a court applies law to fact and renders a decision, that decision continues to govern the issue as the case winds its way through subsequent stages of proceeding. *See, e.g.,* *United States v. Ruppel,* 49 M.J. 247, 253 (C.A.A.F.1998) (citing *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)). In military jurisprudence, law of the case doctrine attaches upon a court's final ruling. *Id.* It "promotes the finality and

efficiency of the judicial process by 'protecting against the agitation of settled issues.'" *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (citation and internal quotation marks omitted). The doctrine does not limit a court's authority, but it does direct its discretion, *Ruppel,* 49 M.J. at 253, and a court should only revisit a decision when it is "clearly erroneous and would work a manifest injustice" if it were to stand. *United States v. Doss,* 57 M.J. 182, 185 (C.A.A.F.2002) (citation and internal quotation marks omitted).

For each of these six AOEs, therefore, we find the appellant's renewed arguments to be without merit. We affirm our prior rulings with respect to each.

### Sentencing Landscape

In this opinion, we find error only with that portion of our 2008 *Walker* opinion that authorized the CA to hold a rehearing on the sole element of premeditation for the murder of LCpl Page. *Walker,* 66 M.J. at 757. Accordingly, we set aside the guilty finding for the premeditated murder of LCpl Page, and reaffirm the appellant's conviction for the unpremeditated murder of LCpl Page. We are now left to consider whether it is appropriate to reassess the appellant's sentence.

It is well-established that "a Court of Criminal Appeals (CCA), in dismissing a charge, may reassess the sentence and that sentence must be equal to or no greater than a sentence that would have been imposed if there had been no error." *United States v. Moffeit,* 63 M.J. 40, 41 (C.A.A.F.2006) (citing *United States v. Sales,* 22 M.J. 305, 308 (C.M.A.1986)). If the CCA is satisfied that "the sentence adjudged would have been of at least a certain severity, then a sentence of that severity or less will be free of the prejudicial effects of error...." *Id.* (citation and internal quotation marks omitted). And if the error was of constitutional magnitude, "then the court must be satisfied beyond a reasonable doubt that its reassessment cured the error." *United States v. Doss,* 57 M.J. 182, 185 (C.A.A.F.2002) (citing *Sales,* 22 M.J. at 307).

In our 2008 opinion, we affirmed the findings of guilt for two specifications under Article 81, two specifications under Article 92, two specifications under Article 118 (one for the unpremeditated murder of LCpl Page and another for the premeditated murder of LCpl James), and the two specifications under Article 134. We continue to affirm those convictions in this opinion. We also affirm the appellant's conviction of armed robbery of LCpl Page.

The appellant's premeditated murder of LCpl James is a violation of Article 118(1) of the UCMJ, an offense which alone carries a mandatory minimum sentence of imprisonment for life. Although the appellant suffered from errors of a constitutional magnitude, we are convinced beyond a reasonable doubt that those errors had no effect on the members' sentencing determination at the rehearing. Our rulings in this opinion do not dramatically change the sentencing landscape. We affirm the approved sentence of confinement for life, a dishonorable discharge, reduction to pay grade E–1, and a reprimand.

### Conclusion

Having previously affirmed the findings of guilt of Specification 1 of Charge I (conspiracy to commit premeditated murder, robbery, and aggravated assault with regard to LCpl Page), Specification 2 of Charge I (conspiracy to kidnap and commit premeditated murder with regard to LCpl James), Specifications 1 and 2 of Charge II (general order violations), Specification 1 of Charge III except for the language "with premeditation" (unpremeditated murder of LCpl Page), Specification 3 of Charge III (premeditated murder of LCpl James), Specification 1 of Charge V (adultery), and Specification 3 of Charge V (kidnapping LCpl James), we now also affirm the finding of guilty of the specification under Charge IV (armed robbery of LCpl Page) and the sentence as approved by the convening authority.

Judge PAYTON–O'BRIEN and Judge WARD concur.